**Bob FINKELSTEIN**

v.

**Sidney BARTHELEMY, Okla Jones, The City of New Orleans, and ABC Insurance Company.**

**Civ. A. No. 87–0669.**

United States District Court, E.D. Louisiana.

Feb. 8, 1988.

As Amended Feb. 8, 1988.

Madeleine M. Slaughter, Covington, La., for plaintiff.

Bruce Whittaker, Asst. City Atty., New Orleans, La., for City of New Orleans.

Lawrence S. Kullman, Lewis & Kullman, New Orleans, La., for Sidney Barthelemy, Okla Jones.

## ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court on motion of defendants Sidney Barthelemy and Okla Jones for summary judgment and on motion of defendant City of New Orleans to dismiss for failure to state a cause of action.[1] By minute entry of January 29, 1988, the Court granted both motions. This Order and Reasons explains the Court's reasons for its ruling.

Few have been Talleyrands; fewer should think they could be. Today, this Court considers whether the Mayor of New Orleans and his City Attorney may demand absolute loyalty of the Assistant City Attorneys who work for them. Because the Court believes such loyalty may, and should, be demanded, the Court must dismiss plaintiff's complaint that he was fired for political patronage reasons.

### I.

Plaintiff, Bob Finkelstein, was appointed an Assistant City Attorney in 1983 by then-City Attorney Salvador Anzelmo and was assigned to be Legal Advisor to the Superintendent of the New Orleans Police Department. Plaintiff is a Republican. He supported and campaigned for William Jefferson, a Democrat, for mayor.

In 1986, when Sidney Barthelemy, another Democrat, became Mayor of the City of New Orleans, he appointed a new City Attorney, Okla Jones. On July 7, 1986, City Attorney Jones told plaintiff and certain other Assistant City Attorneys, who, according to plaintiff, had likewise supported Mr. Jefferson against Mr. Barthelemy, that they were fired effective July 18, 1986.

Soon thereafter, however, City Attorney Jones rehired plaintiff, effective August 11, 1986, and reassigned him to his previous position. According to plaintiff, he was rehired because of a personal appeal to the Mayor and the City Attorney on behalf of plaintiff by Councilman-at-Large Joseph Giarrusso, yet another Democrat. But plaintiff's new tenure was short lived: on October 28, 1986, City Attorney Jones fired plaintiff again, effective November 11, 1986.

In his complaint, plaintiff alleges two related reasons for his discharge. First, he contends he was fired in retaliation for expressing displeasure at being required to campaign for the Mayor's proposed $195 property service charge bill, which failed in September 1986, in part due to the opposition of Councilman Giarrusso. Second, plaintiff contends the Mayor wanted to give plaintiff's position to Bob Early as a political favor to Bob's brother, Councilman Mike Early, for supporting the Mayor on the bill. In short, he contends he was fired for believing in the "wrong" cause and in the "wrong" person.

Irked by this turn of events in the Crescent City, plaintiff brought suit under 42 U.S.C. § 1983 against the Mayor, the City Attorney, and the City of New Orleans[2] and alleges that defendants violated his rights under the First,[3] Fifth,[4] and Four-

1. To the extent the City's motion depends on matters outside the pleadings, the Court treats it as a motion for summary judgment, joining Barthelemy and Jones' motion. *See* F.R.Civ.P. 12(b); *see also* Minute Entry of Jan. 15, 1988.

2. Plaintiff also sued "ABC Insurance Co." as the fictitious insurer of the other defendants. No insurer, of fact or fiction, was ever joined.

3. "Congress shall make no law ... abridging the freedom of speech ...; or the right of the peo-

ple peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment is made applicable to the states by virtue of the due process clause of the Fourteenth Amendment. *See, e.g., Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925).

4. "No person shall be ... deprived of life, liberty, or property without due process of law." U.S. Const. amend. V.

teenth Amendments[5] as well as under state law.[6] He seeks money damages for the alleged wrongful discharge and demands a jury.

## II.

Three main legal questions arise in these motions: (1) whether the federal claims should be dismissed for failure to state a cause of action, (2) whether the claims against the Mayor and the City Attorney should in any event be dismissed under the qualified immunity doctrine, and (3) whether the state law claims should be dismissed if the Court finds that plaintiff has stated no federal cause of action.

### A. *Political Discharges*

Two Supreme Court cases, *Elrod v. Burns*[7] and *Branti v. Finkel*,[8] are central to cases on political patronage discharges of non-civil service government employees.

Writing a "wide-ranging opinion"[9] for a three-justice plurality in *Elrod*, Justice Brennan denounced the so-called patronage system of government service. He held that the practice of patronage dismissals— at least as to the four, non-civil-service plaintiffs: the Chief Deputy of the Process Division at the Cook County Sheriff's Office in Chicago, a bailiff/security guard, a process server, and another office employee[10]—was unconstitutional under the First and Fourteenth Amendments.

In explaining his opinion, he wrote that "[l]imiting patronage dismissals to policymaking positions is sufficient to achieve th[e] governmental end" in supporting patronage.[11] While it is not entirely clear whether this limitation formed a part of the plurality's holding, Justice Brennan noted the following about the limitation:

No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.[12]

Plaintiffs being far from this line described above, Justice Brennan held Sheriff Elrod's alleged actions to be illegal.

Justices Stewart and Blackmun—the necessary votes in support of the judgment— found it unnecessary to address "the broad contours"[13] of the patronage system the plurality attacked. They joined solely because, in words typical of Justice Stewart's epigrammatic style, "a nonpolicymaking, nonconfidential government employee can[not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs."[14]

---

**5.** "... No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *Id.* amend. XIV, § 1.

**6.** Plaintiff alleges pendent state law claims under La.Rev.Stat.Ann. § 23:961 (West 1985) (on dismissing employees for political reasons) and under Louisiana tort law for intentional infliction of emotional distress and for negligent infliction of injury.

**7.** 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

**8.** 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**9.** *Elrod*, 427 U.S. at 374, 96 S.Ct. at 2690 (Stewart, J., concurring).

**10.** *Id.* at 350–51, 96 S.Ct. at 2678 (opinion of Brennan, J.).

**11.** *Id.* at 367, 96 S.Ct. at 2687; *see also id.* at 372, 96 S.Ct. at 2689.

**12.** *Id.* at 367–68, 96 S.Ct. at 2687.

**13.** *Id.* at 374, 96 S.Ct. at 2690 (Stewart & Blackmun, JJ., concurring in judgment).

**14.** *Id.* at 375, 96 S.Ct. at 2690.

Thus rested Court authority until 1980, when the Court decided *Branti v. Finkel.* "While *Elrod* concerned Republicans purged from a large, metropolitan sheriff's office merely because of their national political affiliation, *Branti v. Finkel* comes closer home in some respects to our present concerns." [15]

In *Branti,* two Staten Island assistant public defenders (APDs) were to be purged from their jobs solely because they were not members of the controlling political party of the borough. After an eight-day hearing, the district court "found that they did not occupy any confidential relationship to the policymaking process, and did not have access to confidential documents that influenced policymaking deliberations." [16] In light of these and other factual findings, the court permanently enjoined the Rockland County Public Defender from firing or attempting to fire the two "upon the sole ground of their political beliefs." [17] The Second Circuit affirmed. [18]

In the course of affirming the Second Circuit, Justice Stevens, writing for a 6–3 majority, "appeared to narrow the *Elrod* rule significantly." [19] In articulating the *Elrod* rule in a narrower form, Justice Stevens injected the adjective "private" to modify "political beliefs." [20] As he stated, "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." [21] Further, in restating the significant exception to the *Elrod* rule, Justice Stevens wrote:

In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. [22]

That the majority altered the exception is confirmed by the two dissents. [23]

Having thus framed the issue, Justice Stevens explained why the two APDs did not come within the exception:

> The primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State.... [W]hatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests. Similarly, although an assistant is bound to obtain access to confidential information arising out of various attorney-client relationships, that information has no bearing whatsoever on partisan political concerns. Under these circumstances, it would undermine, rather than promote, the effective performance of an assistant public defender's office to make his tenure dependent on his allegiance to the dominant political party. [24]

In an accompanying footnote to this quote, Justice Stevens contrasted the responsibilities of APDs to those of officials such as a prosecutor. Expressing "no opinion as to whether the deputy of such an official could be dismissed on grounds of political party affiliation or loyalty," [25] he merely

---

**15.** *McBee v. Jim Hogg County, Texas,* 730 F.2d 1009, 1012 (5th Cir.1984) (en banc).

**16.** 445 U.S. at 511, 100 S.Ct. at 1291.

**17.** *Id.* at 508–09, 100 S.Ct. at 1290 (citing 457 F.Supp. 1284, 1285 (S.D.N.Y.1978)).

**18.** 598 F.2d 609 (2d Cir.1979) (opinion unpublished).

**19.** *McBee,* 730 F.2d at 1012.

**20.** *Id.* at 1012; *see Branti,* 445 U.S. at 516, 517, 100 S.Ct. at 1293, 1294.

**21.** 445 U.S. at 517, 100 S.Ct. at 1294 (citing *Elrod,* 427 U.S. at 366, 96 S.Ct. at 2686).

**22.** *Id.* 445 U.S. at 518, 100 S.Ct. at 1295.

**23.** *See id.* at 520–21, 100 S.Ct. at 1296 (Stewart, J., dissenting); *id.* at 523–25, 100 S.Ct. at 1297–98 (Powell, J., dissenting).

**24.** *Id.* at 519–20, 100 S.Ct. at 1295 (footnotes omitted).

**25.** *Id.* at 519 n. 13, 100 S.Ct. at 1295 n. 13.

cited *Newcomb v. Brennan,*[26] in which the Seventh Circuit affirmed the dismissal of the complaint of a deputy city attorney who was fired when, contrary to the wishes of the city attorney, he announced his intention to run for Congress.

While the Supreme Court has generally drifted away from the absoluteness of Justice Holmes' observation that "[a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman," [27] the Court continues to cabin its rapid expansion of government employees' First Amendment rights to "nonpolicymaking" positions.[28] As Justice White wrote in *Connick v. Myers,*[29] reversing this Court and the Fifth Circuit:

> When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.[30]

Evidence of a plaintiff's disruptive conduct is, thus, not the controlling test a defendant must meet.[31]

■ This Court does not infer from these cases that a government employee loses all First Amendment rights as to his employer once he is arguably within the *Elrod / Branti* exception.[32] On the contrary, this Court must balance a government employee's interests as a citizen in speech and associational rights and the government's interests as an employer in loyal, trustworthy, and competent service.[33] This balancing is ultimately a matter of law, not a matter of fact for a jury alone to decide.[34] In a summary judgment motion to dismiss, as here, this Court must simply accept plaintiff's allegations of why he was fired.[35]

Further, this Court does not infer from these cases that an official can violate the constitution only when the sole reason for the dismissal is because of the employee's *national* political party affiliation, for these labels of national party affiliation are but convenient rubrics for the legal conclusion that a person comes within the *Elrod / Branti* exception. A more general, appropriate label, especially for disputes in local politics where some of the concerns of national politics are not wholly applicable, is member of the "out party" or, better, "out faction." Nor does the Court infer that an employee is protected only at inauguration time, for the employee may become a member of the "out faction" long after the controlling official has been elected. In the end, it is not the labels or the timing that controls, but rather the inquiry they help

---

**26.** 558 F.2d 825 (7th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977).

**27.** *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892); *see also Connick v. Myers,* 461 U.S. 138, 143–44, 103 S.Ct. 1684, 1688, 75 L.Ed.2d 708 (1983) (discussing the Court's change in direction).

**28.** *See Rankin v. McPherson,* —— U.S. ——, ——, 107 S.Ct. 2891, 2902, 97 L.Ed.2d 315 (1987) (Scalia, J., dissenting); *see also id.* at ——, 107 S.Ct. at 2900 (Marshall, J.) (holding that a county constable violated the First Amendment by firing a clerical employee for remarking in a private conversation to a coemployee, after they learned of John Hinkley's attempt on President Reagan's life, "If they go for him again, I hope they get him.").

**29.** 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), *rev'g* 654 F.2d 719 (5th Cir.1981) (no published opinion), *aff'g* 507 F.Supp. 752 (E.D. La.1981) (Gordon, J.).

**30.** *Id.* at 151–52, 103 S.Ct. at 1692.

**31.** *See id.* at 158, 167–68, 103 S.Ct. at 1696, 1700–01 (Brennan, J., dissenting).

**32.** *See Alfaro de Quevedo v. de Jesus Schuck,* 556 F.2d 591, 592 (1st Cir.1977).

**33.** *See Connick,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708; *see also McBee,* 730 F.2d at 1013–14, 1016.

**34.** *Cf. Connick,* 461 U.S. at 148 n. 7, 150 n. 10, 103 S.Ct. at 1690 n. 7, 1692 n. 10 (appeals courts have an obligation to make an independent constitutional judgment on the facts).

**35.** *See* F.R.Civ.P. 56(b). Although defendants deny plaintiff's allegations of why he was fired, defendants do not contest these allegations for purpose of these motions.

address: whether the employee's private political beliefs could interfere with the effective discharge of his public duties.[36]

While no Supreme Court case has faced a plaintiff within the *Elrod/Branti* exception, several lower court cases,[37] concerning as here government attorneys, have addressed the exception and ruled on the issue reserved in Justice Stevens' footnote.[38] These decisions show that most government attorneys are properly treated differently from the two APDs in *Branti* since most government attorneys are in positions of government policymaking and hold confidences of government leaders through attorney/client relationships. As the Seventh Circuit noted about prosecutors, their "client" is not an individual, but society as a whole, and assistant prosecutors, in carrying out their duties, make certain decisions that actually create policy.[39]

Several of these courts looked to the state statutes, city charters, and city codes of ordinances to determine the duties of their plaintiff attorneys.[40] These courts, either expressly[41] or implicitly, rejected the plaintiffs' attempts to portray their roles as limited, technical, neutral ones, for "the relevant inquiry focuses on the function of the 'public office' involved, not the function of the particular employee occupying the office."[42] As one court explained about an assistant city attorney whose duties had

**36.** *See Branti*, 445 U.S. at 517, 100 S.Ct. at 1294.

**37.** *See Bauer v. Bosley*, 802 F.2d 1058 (8th Cir. 1986) (reversing order of reinstatement of plaintiff who, according to the jury verdict, was fired from his position as Staff Legal Assistant II in the St. Louis Circuit Court Clerk's Office for political reasons), *cert. denied*, — U.S. —, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987); *Livas v. Petka*, 711 F.2d 798 (7th Cir.1983) (affirming a bench trial dismissal of claims by an assistant state prosecutor who alleged that he was dismissed for not supporting his boss' successful reelection bid; holding in the alternative that plaintiff's complaint stated no cause of action); *Ness v. Marshall*, 660 F.2d 517 (3d Cir.1981) (affirming summary judgment against a former city solicitor and two former assistant city solicitors who alleged they were fired because they were Republicans and the new mayor a Democrat); *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir.) (affirming the dismissal of the complaint by a deputy city attorney), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); *Alfaro de Quevedo v. de Jesus Schuck*, 556 F.2d 591 (1st Cir.1977) (reversing damage award to former Director of Puerto Rico's Office of Criminal Justice; as an attorney, the Director had broad discretion and rendered legal advice to the Secretary of Justice); *Mummau v. Ranck*, 531 F.Supp. 402 (E.D.Pa.) (granting summary judgment against an assistant district attorney who only prosecuted juvenile cases), *aff'd per curiam*, 687 F.2d 9 (3d Cir.1982) (extending the holding in *Ness* from civil attorneys to criminal attorneys); *Forman v. City of New Orleans*, Civ. 80–1654 (E.D.La. bench opinion Dec. 3, 1980) (granting summary judgment against a former attorney for the Downtown Development District of the City of New Orleans who was fired when Mayor Morial took office), *aff'd per curiam without written opinion*, 651 F.2d 775 (5th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981); *Catterson v. Caro*, 472 F.Supp. 833 (E.D.N.Y.1979) (granting summary judgment against a former County Attorney of Nassau County).

**38.** *See supra* text accompanying notes 25–26. This Court has found no appellate opinion, except *Branti* itself, where a government attorney dismissed for political reasons was able to recover. *But cf. Horne v. Merit Systems Protection Board*, 684 F.2d 155, 158 & n. 7 (D.C.Cir.1982) (federal civil service regulations suggest that certain career ICC attorneys are not "political employees"). The Court has found only one, 2½ page district court opinion holding in a government attorney's favor. *See Layden v. Costello*, 517 F.Supp. 860 (N.D.N.Y.1981) (permanently enjoining defendants from firing plaintiff, attorney for a county's Department of Social Services, solely for political purposes); *cf. Tavano v. County of Niagara, New York*, 621 F.Supp. 345 (W.D.N.Y.1985) (finding that plaintiff, an Assistant County Attorney for Family Court, whose sole duties were to assist persons in Family Court, was not "a policymaker," but holding that the reasons for his discharge were legitimate and thus dismissing his complaint), *aff'd*, 800 F.2d 1128 (2d Cir.1986) (no published opinion).

**39.** *Livas*, 711 F.2d at 800–01.

**40.** *Ness*, 660 F.2d at 521; *Newcomb*, 558 F.2d at 827 & nn. 2–4, 829; *Mummau*, 531 F.Supp. at 404–05, *aff'd*, 687 F.2d at 10; *Catterson*, 472 F.Supp. at 837.

**41.** *See Ness*, 660 F.2d at 521; *Mummau*, 531 F.Supp. at 405.

**42.** *Mummau*, 531 F.Supp. at 405; *see also Bauer*, 802 F.2d at 1064; *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); *Alfaro de Quevedo*, 556 F.2d at 593 n. 4; *cf. Gannon v. Daley*, 561 F.Supp. 1377, 1385 n. 22

been largely limited to the public housing area, a mayor should be free to distribute assignments among his city attorneys in an entirely different fashion and however he sees fit.[43]

In sum, to determine if the Mayor and his City Attorney may demand absolute loyalty of their Assistant City Attorneys and may fire those who, in their eyes, do not exhibit such loyalty, this Court must consider what is and should be expected of a person in the position of Assistant City Attorney, that is, must determine if such a person can function properly in that position without such loyalty.

### B. Qualified Immunity

■ Whether or not plaintiff's entire complaint can withstand summary judgment, the Mayor and the City Attorney may nonetheless be entitled to summary judgment on other grounds, for government officials sued in their individual capacity enjoy "qualified immunity" from civil suits for monetary damages.[44] As the Supreme Court stated:

We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excess disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge

appropriately may determine, not only the current applicable law, but whether that law was clearly established at the time the action occurred. If the law at that time was not clearly established, an official could not ... fairly be said to "know" that the law forbade conduct not previously identified as unlawful.[45]

In short, the touchstone of the defense is "objective legal reasonableness."[46] The issue, then, is whether the particularized law on the discharge of a government attorney for political reasons was clearly established in plaintiff's favor in 1986 so that the Mayor and the City Attorney should have reasonably known their conduct was illegal.

■ As to a defendant municipality, however, there can be no immunity defense. The law is well established that "[q]ualified immunity protects 'individuals acting within the bounds of their official duties, not the governing bodies on which they serve.' "[47]

### C. Pendent State Claims

■ A federal court has broad constitutional power under Article III[48] to hear pendent state law claims along with federal claims when both the federal and state claims arise from a common nucleus of operative facts.[49] But if the federal claim is too insubstantial to be the basis for federal subject matter jurisdiction, there can be no pendent jurisdiction over the state law claims.[50]

■ When a federal court has the power to assert pendent jurisdiction, it asserts that jurisdiction under "a doctrine of dis-

---

(N.D.Ill.1983) (the "function," not the "label," of a position controls).

**43.** *Ness,* 660 F.2d at 522.

**44.** *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 3019 n. 12, 82 L.Ed.2d 139 (1984) (applying the same standard to § 1983 actions).

**45.** *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (footnotes and citations omitted).

**46.** *Anderson v. Creighton,* — U.S. —, —, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

**47.** *E.g., Lynch v. Cannatella,* 810 F.2d 1363, 1371 (5th Cir.1987); *see also Owen v. City of Indepen-*

*dence, Missouri,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

**48.** "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States...." U.S. Const. art. III, § 2.

**49.** *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

**50.** *See Junker v. Crory,* 650 F.2d 1349, 1357 n. 6 (5th Cir.1981); *see also* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567.1, at 144 & n. 4 (2d ed. 1984).

cretion, not of plaintiff's right." [51] In determining whether to exercise its discretion, this Court is to consider "judicial economy, convenience and fairness to litigants" and should avoid "[n]eedless decisions of state law." [52] If before trial the Court dismisses the federal claims on a motion to dismiss or for summary judgment, even if "not insubstantial in a jurisdictional sense," the Court should ordinarily dismiss the state law claims as well.[53] Relevant, though perhaps not determinative, to the exercise of this discretion is whether the state law claims would be barred in state court by the applicable statute of limitations.[54] Not being on the merits, any such dismissal of these state law claims is without prejudice.[55]

### III.

As explained below, the Court determines that the answer to each of the three questions raised in Part II is yes.

### A. Political Discharges

The issue before the Court in this Part is not simply whether the Mayor and the City Attorney may fire plaintiff solely for having supported William Jefferson in the mayor's race, nor is the issue solely one of Donkeys against Elephants.[56] Rather, the full issue encompasses the question whether the Mayor and the City Attorney were entitled to fire plaintiff for not supporting the Mayor on his unsuccessful property bill and to replace plaintiff with someone more to the Mayor's liking—whether political patronage was a legally sufficient reason for firing plaintiff. Upon balancing plaintiff's interests against the Mayor and the City Attorney's, the Court determines as shown below that as a matter of law plaintiff has stated no federal cause of action.

The position of Assistant City Attorney for the City of New Orleans is one of

---

The recent Supreme Court case of *Carnegie–Mellon University v. Cohill*, —— U.S. ——, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988), decided on the same day as the oral argument in this action, does not necessarily alter this rule. The Supreme Court noted that a pre-trial dismissal of all federal law claims does not mandate in every case a dismissal (or remand) of pendent state law claims. *Id.* at ——, n. 7, 108 S.Ct. at 619, n. 7 (citing *Rosado v. Wyman*, 397 U.S. 397, 403–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970)); *see also Brunswick v. Regent*, 463 F.2d 1205, 1206–07 (5th Cir.1972) (per curiam) (federal district court retained jurisdiction to decide state law claims where the plaintiff indicated at the pre-trial conference that he would not be pursuing his federal claim). The Court, however, was silent on the effects on the pendent claims where the federal claims are dismissed for lack of subject matter jurisdiction because of a failure to state a cause of action; instead, the Court was largely concerned with dismissals on the merits of valid federal claims and dismissals arising from post-filing/post-petition events. *See, e.g., Cohill*, —— U.S. at ——, 108 S.Ct. at 616, (plaintiffs voluntarily dismissed their federal law claims after removal); *Rosado*, 397 U.S. at 404 & n. 6, 90 S.Ct. at 1214 & n. 6 (*"Unlike insubstantiality, which is apparent at the outset, mootness, frequently a matter beyond the control of the parties, may not occur until after substantial time and energy have been expended looking toward the resolution of a dispute that plaintiffs were entitled to bring in federal court."* (emphasis added)).

**51.** *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139; *Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir.1981).

**52.** *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139; *see Gregory*, 634 F.2d at 202 (recognizing that a state law claim raised a novel issue of state law); *cf. Cohill*, —— U.S. at ——, 108 S.Ct. at 618, ("a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties").

**53.** *Slaughter v. Allstate Insurance Co.*, 803 F.2d 857, 859 (5th Cir.1986); *Tinker v. De Maria Porsche–Audi, Inc.*, 632 F.2d 520, 523 (5th Cir. 1980); *see Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139; *Cohill*, —— U.S. at —— & n. 7, 108 S.Ct. at 619 & n. 7.

**54.** *Pharo v. Smith*, 625 F.2d 1226, 1227 (5th Cir.1980) (per curiam); *see also L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 429 (11th Cir.1984) (citing, among others, *Gregory*, 634 F.2d at 202). *See generally Cohill*, —— U.S. at ——, 108 S.Ct. at 619–20; Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code*, 13 Law & Contemp.Probs. 216, 231–33 (1948) (discussing the rationale for this factor), *cited in Gibbs*, 383 U.S. at 726 n. 15, 86 S.Ct. at 1139 n. 15.

**55.** *Martin v. T.V. Tempo, Inc.*, 628 F.2d 887, 891 (5th Cir.1980).

**56.** As plaintiff admits in his brief, "the fact that the parties are not identified as either Democrat or Republican makes the politics involved here no less partisan." Plaintiff's Memorandum in Opposition at 4.

unclassified service.[57] As such, the position on the one hand holds no right to appeal a termination of employment to the State or City Civil Service Commission,[58] but on the other is not subject to the state laws on certification for permanent appointments and promotions [59] or to the prohibitions against political activities.[60] In a sentence, New Orleans Assistant City Attorneys are "at will" employees of the city.[61]

The Home Charter for the City of New Orleans sets forth the following as the functions of the city's Department of Law:

The Department of Law, headed by the City Attorney shall:

(1) Direct and supervise the legal affairs of the City.

(2) Provide legal advice to the Mayor and Council when requested and, when directed by the Mayor to all offices, departments, and boards concerning any matter affecting the interests of the City.

(3) Have charge of all legal matters in which the City has an interest, or to which the City is a party, with power and authority, when directed by the Mayor, or the Council to institute and prosecute or to intervene in any and all suits or other proceedings, civil or criminal, as may be deemed necessary for the assertion or protection of the rights and interests of the City.

(4) Prepare proposed ordinances when requested by the Mayor or any member of the Council.

(5) Prepare, or approve as to form and legality, all contracts, documents, and instruments creating any legal or conventional obligation affecting the City.

(6) Perform all other duties required by this Charter, the Mayor, or the Council and not inconsistent with the functions of this Department.[62]

As Assistant City Attorney, plaintiff could have been called upon to perform any one or all of these enumerated tasks. These laws establish that his duties were of the " 'broad scope' ... equated with a policy-making function" [63] and that he functioned "in a highly discretionary role ... [beyond] the simple exercise of ministerial competence." [64]

While not disputing that he held a confidential attorney/client relationship with those whom he advised or that he could be asked to perform any of the tasks above, plaintiff argues that in fact he personally advised just the Police Department, which Police Superintendent Warren Woodfork has headed for both Mayors Morial and Barthelemy, and did not form broad goals or policies for the Mayor or City Council or perform many of the other tasks above. This argument, however, does not save plaintiff, for the relevant inquiry concerns the functions of the "public office" of Assistant City Attorney as a whole, and not the particular person in that office.[65] The following three points further explain the flaws in plaintiff's argument.

---

**57.** *See* La. Const. art. 10, § 2(B)(10) (1974) ("employees ... of the offices of ... each mayor and city attorney").

**58.** *Wilkinson v. Louisiana State University,* 316 So.2d 482 (La.App. 1st Cir.), *writ denied,* 322 So.2d 772 (La.1975); *see* La. Const. art. 10, § 8(A).

**59.** *See* La. Const. art. 10, § 7.

**60.** *Id.* art. 10, § 9(A); *cf.* Op.Atty.Gen. 76–1113 (Mar. 28, 1976) (being unclassified employees, school teachers may engage in political activities).

**61.** The New Orleans City Charter specifically treats the City Attorney differently from all other city department heads. *Compare* Home Rule Charter of the City of New Orleans [City Char-

ter] § 4–106(1) (City Attorney "shall be appointed and removed by the Mayor") *with id.* § 4–106(2) (all other department heads "shall be appointed and may be removed by the Chief Administrative Office with the approval of the Mayor"). While applicable only to department heads, these Charter provisions evince the special place attorneys hold in government administrations in general and in New Orleans in particular.

**62.** *Id.* § 4–401.

**63.** *Newcomb,* 558 F.2d at 829.

**64.** *Id.* at 830.

**65.** *See supra* notes 40–43 and accompanying text.

First, unlike the confidential relationship of the APDs in *Branti*, the confidential relationship of plaintiff and the other Assistant City Attorneys is not with individual citizens, but with city officials representing the city as a whole. It is axiomatic that an attorney is to give his clients his utmost loyalty.[66] As plaintiff's "client" and employer, the Mayor, on his own behalf and through his city officials, has "the right to receive the complete cooperation and loyalty of a trusted adviser, and should not be expected to settle for less." [67]

Second, the work of an Assistant City Attorney is no less policymaking work, on which the Mayor's trust and confidence must depend, simply because that work may be reviewed by one or more supervising Deputy City Attorneys.[68] This need for review of plaintiff's work, in fact, supports the conclusion that the type of work Assistant City Attorneys perform is of a discretionary nature beyond ministerial competence—and with any power to exercise discretion comes the power to set policy. Policymaking does not simply mean

drafting articulated written statements to be read at a press conference or lobbying for amendments of laws.[69] To the contrary, it should be understood in the broader sense of discretionary functions the Mayor expects to be executed with full understanding and support of his position. The Mayor and the City Attorney should be free to reorganize the City Attorney's Office, perhaps where less direct supervision of the junior attorneys' work is given.[70]

Finally, plaintiff's own complaint shows that not all the work he did was solely "police work." Like the other Assistant City Attorneys, he had to do work for the Mayor on the Mayor's proposed property bill; in his complaint, plaintiff alleges that he opposed the bill and did not like having to work on it. As the Supreme Court noted in *Connick*,[71] the Mayor may first act without having to wait for firm evidence of subterfuge by those assisting him with open regret on his policies. The effective operation of representative government would be most crippled if on the one hand a

---

**66.** *E.g.,* La.Code of Prof.Responsibility EC 5-1.

**67.** *Ness,* 660 F.2d at 522. It is perhaps in this context of the city as the attorney's client that Justice Stewart's law firm analogy—rejected by the majority in *Branti* where the attorneys' actual clients were not government officials, but rather individuals opposing the government—is appropriate. *Compare Branti,* 445 U.S. at 521, 100 S.Ct. at 1296 (Stewart, J., dissenting) *with id.* at 520 n. 14, 100 S.Ct. at 1295–96 n. 14 (opinion of Stevens, J.).

**68.** *See* City Charter § 4–402(2) ("The professional staff of the [City Attorney's Law] Department shall consist of senior and junior licensed attorneys."). An analogy to the way the federal judiciary functions demonstrates this point. In ruling in a case, this Court often must set policies; these rulings are not robbed of their policymaking nature merely because the Fifth Circuit and the Supreme Court may review them.

**69.** Notwithstanding plaintiff's efforts to define policymaking narrowly so as to characterize his work as not being "policymaking," evidence he has submitted affirmatively shows that some of his police work fell even within this narrower definition. In a questionnaire from the Chief Deputy City Attorney, plaintiff listed the following among his most significant accomplishments: defending the City and the Police Department from having to produce initial police reports under public records legislation and

then lobbying at the State Legislature for amendment of that legislation. *See* General Questionnaire, question 5 (undated), *reprinted in* Plaintiff's Memorandum in Opposition, Exh. 4, at 4. Lobbying by its very nature is largely incapable of being closely supervised; a lobbyer who misrepresents his lobby often does irreparable damage, which the lobbyer's supervisor or principal would be unable to remedy.

**70.** *See supra* text accompanying note 43. Plaintiff argues that in fact no reorganization of the City Attorney's Office was made, for immediately after plaintiff was fired the second time, Bob Early was hired to take over his position advising the Police Department. First, as already noted, the relevant inquiry is not limited to what has actually happened in the City Attorney's Office, but rather it encompasses what the Mayor and the City Attorney may permissibly and potentially do with the Office. Second, the Court should not infer that no reorganization was made merely because plaintiff's position as "police attorney" was immediately refilled; if the Mayor and the City Attorney believed that less supervision of the Assistant City Attorneys was appropriate or necessary, then they should be entitled to entrust the work of their Assistant City Attorneys to those who presumably believe in and understand the same policies and goals as these two wish to pursue.

**71.** *See supra* text accompanying notes 29–31.

mayor, for example, had to depend to a great extent on his attorney advisors to help him implement his policies and on the other hand those attorneys were entitled to denigrate those very policies without fear of recourse; our federal constitution does not mandate such extremes.

At oral argument, plaintiff's counsel argued that the citizens and taxpayers of New Orleans have a strong (and, as she would presume, overriding) interest in having stability and continuity in the City Attorney's Office; as the chiefs come and go, New Orleanians, she argued, should be able to rely on a core group of career attorneys who remain from administration to administration. While this interest is often a good thing, this Court cannot hold that it is an interest our federal constitution requires. Citizens have remedies if they dislike the present statutory organization of the City Attorney's Office, but these remedies are at the voting booths, not in this Court: the citizens of New Orleans can either vote to keep the incumbent administration in office or, if more ambitious, cause, through voting or legislative appeal, the City Attorney's Office to be restructured to provide for certain tenured, classified positions. The citizens of this city and state have already decided which government employees should be classified and which unclassified; this Court, under the guise of constitutional necessity, should not upset this political, nonjusticiable determination.

As Judge Beer of this Court noted in *Forman v. City of New Orleans*,[72] attorneys who work for a local government should realize, even before they are hired, that their tenure often has much less to do with their competency than with the day-to-day happenstance of partisan affiliations of the local leaders whom they advise and counsel.[73] Unlike most civil servants, government attorneys, by the very nature of their being attorneys, are to advocate the positions of and to counsel the govern-

ment officials for whom they work. A government official, whose very work concerns politics, is entitled to have his advocates/counselors be persons who support his politics and to fire those who do not share his beliefs.

Perhaps plaintiff's dismissal was unfair, but "ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." [74]

■ In conclusion, the Court determines that the interests of the Mayor and the City Attorney in having Assistant City Attorneys who fully support their policies outweigh plaintiff's interests in opposing those policies while he remains an Assistant City Attorney; having thus balanced these competing interests, the Court must conclude that plaintiff has not stated a federal cause of action for wrongful discharge in violation of the federal constitution.

### B. *Qualified Immunity*

The parties do not dispute what elements constitute this defense. Rather, they appear only to dispute whether the law "was clearly established" against defendants so as to preclude them from asserting the defense.

Even if the entire action were not dismissed for failure to state a cause of action, it should be dismissed as to the Mayor and the City Attorney (but not as to the City), for plaintiff is only seeking money damages from these two and cannot show that the law was "clearly established" in his favor at the time he was fired. The sole fact that this Court believes that plaintiff has stated no federal cause of action should be sufficient to show that the Mayor and the City Attorney were not objectively unreasonable in believing they could fire plaintiff as they did. But for clarity's

---

**72.** Civ. 80–1654 (E.D.La. bench opinion Dec. 3, 1980), *aff'd per curiam without opinion*, 651 F.2d 775 (5th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981).

**73.** Tr. at 2–3, 12–15, *reprinted in* Motion of Barthelemy and Jones, Exh. A.

**74.** *Connick*, 461 U.S. at 146–47, 103 S.Ct. at 1690.

sake, the Court notes a few additional points.

The mere existence of the *Elrod /Branti* rule against political discharges does not, of itself, clearly establish the applicable law to be in plaintiff's favor, for those very cases articulate a confidential/policymaking exception that acknowledges that political discharges are constitutionally permissible in certain circumstances. The circuit cases cited in Part II(A) above illustrate this point by having upheld political dismissals of various government attorneys, even of those whose actual work was narrowly limited to specific, noncontroversial areas and who had several supervisors over them. These cases are easily read to suggest that Mr. Finkelstein, like the plaintiffs in these cases, comes within the *Elrod /Branti* exception and thus can state no constitutional cause of action for his discharge. At the least, these cases show a reluctance to define the exception too narrowly.[75]

In the only other case of which this Court is aware concerning a New Orleans city attorney, this Court upheld the Mayor's discharge even if for political reasons, the Fifth Circuit affirmed, and the Supreme Court declined review.[76] Further, the controlling en banc Fifth Circuit decision in *McBee v. Jim Hogg County, Texas*[77] suggests that a case-by-case analysis is necessary even for those public employees not within the *Elrod /Branti* exception and that there is no plaintiff-always-wins-if-he-proves-political-discharge rule. Finally, no Fifth Circuit, or other circuit, case of which this Court is aware has held or even suggested in dictum that a government *attorney* (other than a public defender and possibly a government legal aid attorney) cannot be fired for political reasons without offending the First Amendment.

In sum, with the law not clearly established in plaintiff's favor, the Mayor and the City Attorney could have believed in good faith and with objective reasonableness that the firing was constitutionally permissible. Accordingly, the Court holds in the alternative as to the Mayor and the City Attorney only that plaintiff's claims against them should be dismissed under the qualified immunity doctrine.

## C. *Pendent State Claims*

Having determined that plaintiff has stated no federal cause of action under either 28 U.S.C. § 1331 or 28 U.S.C. § 1343(a), the two subject matter jurisdictional bases pleaded in the complaint, this Court must determine whether it may or should exercise jurisdiction over the pendent state law claims. The parties do not dispute that the state and alleged federal claims arise "from a common nucleus of operative facts," namely, the facts surrounding the discharge and the reasons for the discharge.

As shown in Part III(A) above, the Court lacks subject matter jurisdiction over plaintiff's alleged federal claims because those claims state no federal cause of action; plaintiff's federal claims are, in other words, "insubstantial in a jurisdictional sense."[78] Perforce, then, this Court lacks the power to assert pendent jurisdiction to hear plaintiff's state law claims, even though they arise from the same nucleus of operative facts as the (alleged) federal claims.

■ But even if this Court had such power, it would exercise its discretion to deny asserting such jurisdiction, for there are no "special circumstances" warranting the exercise of jurisdiction in order to hold a trial where no substantial federal question would be involved. While plaintiff's Louisiana tort law claims appear to present no new or difficult issues of law, his claim under Louisiana Revised Statute § 23:961 does appear to present at least two novel issues of state law, namely, (1) the applica-

---

**75.** *Juarbe–Angueira v. Arias,* 831 F.2d 11, 13 (1st Cir.1987).

**76.** *See Forman v. City of New Orleans,* Civ. 80–1654 (E.D.La. bench opinion Dec. 3, 1980), *aff'd per curiam without opinion,* 651 F.2d 775 (5th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 110 (1981).

**77.** 730 F.2d 1009 (5th Cir.1984) (en banc).

**78.** *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139.

bility of the statute to a municipality as employer or to a municipal officer as supervisor and (2) the relationship between the statute and the state law immunity defense.[79] Further, the applicable statute of limitations would not bar plaintiff from pursuing his state law claims in state court.[80]

In sum, this Court lacks the jurisdictional power to adjudicate plaintiff's pendent state law claims; further, even if the Court did have such power, it would exercise its discretion to decline from hearing such claims. Accordingly, plaintiff must bring such claims in state court if he still wishes to pursue them.

## IV.

The Mayor of New Orleans and his City Attorney have the right to fire any Assistant City Attorney at any time for any reason, political or otherwise, and thus

plaintiff states no federal constitutional claim for any wrongful discharge. In addition, these two are protected by the qualified immunity doctrine from plaintiff's claims for money damages, for the law is not well settled in plaintiff's favor. Finally, with no valid federal claims, this Court lacks jurisdiction to hear plaintiff's state law claims and, even if it had jurisdiction, would decline to exercise it. Accordingly, the Court dismissed plaintiff's entire complaint.

The Clerk of Court is directed to enter judgment dismissing plaintiff's complaint at plaintiff's costs.[81]

---

**79.** *See McCormick v. Edwards,* 479 F.Supp. 295, 302 (M.D.La.1979), *rev'd on other grounds,* 646 F.2d 173 (5th Cir.), *cert. denied,* 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981); *cf. Boyer v. St. Amant,* 364 So.2d 1338, 1340–41 (La.App. 4th Cir.) (statute did not apply where deputy sheriff was fired by his sheriff, for the state, not the sheriff, was plaintiff's employer), *writ denied,* 365 So.2d 1108 (La.1978). The sole two remaining reported cases to address the statute offer little help. *See Peacock v. West Carroll Parish Police Jury,* 454 So.2d 1253 (La.App.2d Cir.1984) (affirming judgment for defendants that plaintiff failed to prove he was fired for political reasons); *Davis v. Louisiana Computing Corp.,* 394 So.2d 678 (La.App. 4th Cir.) (affirming judgment for plaintiff), *writ denied,* 400 So.2d 668 (La.1981).

**80.** The action was filed on February 13, 1987, and all three defendants were served by process on March 20, 1987; both dates are well within the applicable one-year prescriptive period for delictual actions. La.Civ.Code art. 3492 (West 1988). Thus, prescription as to any action in state court has been interrupted. *See id.* art. 3462; *Conner v. Continental Southern Lines, Inc.,* 294 So.2d 485, 487–88 (La.1974). Prescription commences to run anew from the last day of the interruption. La.Civ.Code art. 3467. If this Court had jurisdiction over the state claims, then this Court would presumably be "a competent court" within the meaning of the Code articles on prescription even if the Court in its discretion declined to exercise that jurisdiction; as such, the interruption would "continue[ ] as long as the suit is pending." *Id.* art. 3463. If this Court would not be "a competent court" in

such circumstances, there is some question about what the last day of interruption would be in this case—whether this interruption would continue as long as this action remained pending or rather would merely start the prescriptive period running again on the date this action was filed. *See LaFargue v. St. Amant,* 433 So.2d 1061, 1063 (La.App. 5th Cir.), *writ denied,* 435 So.2d 427 (La.1982). *But cf.* La.Civ.Code art. 3463 comment (c) ("An interruption of prescription resulting *from the service of process* in an action filed in an incompetent court ... continues as long as the suit is pending." (emphasis in original)). The Court need not decide the issue, but notes that *at the worst* plaintiff has until February 13, 1988 to bring an action in state court and that the Court notified all counsel on January 29, 1988 by telephone and by minute entry that it was dismissing plaintiff's entire complaint.

**81.** Notwithstanding the Court's dismissal of plaintiff's claims, this Court does not find plaintiff's action to be so frivolous, unreasonable, or without foundation so as to require the award of attorney's fees to the prevailing defendants; the Court exercises its discretion to deny such fees. *See* Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1982); *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). The costs, however, may still be awarded to the prevailing defendants even if not entitled to attorney's fees. *See* F.R.Civ.P. 54(d); *Jones v. City of San Antonio,* 568 F.2d 1224, 1226 (5th Cir.1978). *See generally* 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* § 2666, at

173–74 (2d ed. 1983) (distinguishing costs, expenses, and attorney's fees).