Lawrence F. TRANELLO, Plaintiff,

v.

Thomas R. FREY, Individually and as Monroe County Executive, Patrick M. Malgieri, Individually and as the Monroe County Attorney and The County of Monroe, Defendants.

Civ. No. 88–464L.

United States District Court,
W.D. New York.

March 13, 1991.

Nira T. Kermisch, Rochester, N.Y., for plaintiff.

Gerald L. Paley, Phillips, Lytle, Hitchcock, Blaine & Huber, Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

Lawrence F. Tranello ("plaintiff") commenced this action on May 2, 1988, against defendants Thomas R. Frey, individually and as Monroe County Executive, Patrick M. Malgieri, individually and as Monroe County Attorney and the County of Monroe (County). Plaintiff claims that the defendants discriminated against him by terminating his employment as a Deputy County Attorney, in violation of the First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States, the Civil Rights Statutes, 42 U.S.C. §§ 1981, 1983 and 1985, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq.

This matter is before the Court on defendants' motion for summary judgment. Plaintiff has also cross-moved for summary judgment on the issue of liability. For the reasons that follow, defendants' motion is granted except as to plaintiff's age discrimination claims. Plaintiff's cross-motion is denied in its entirety.

## FACTS

Plaintiff is 63 years old and a registered Republican.

In January 1972, plaintiff was hired by the Monroe County Department of Social Services as Assistant Social Services Counsel. Initially, plaintiff was assigned to handle paternity and child support matters for the Department. Then, in July 1974, plaintiff was elevated to the position of Chief Counsel to the Department of Social Services.

In 1977, plaintiff was assigned to the Support Unit in the Department of Social Services. As part of a reorganization of the County Law Department, authorized by the Monroe County Legislature in May 1985, several new positions were created within the Department of Law.

As a result of this reorganization, the attorneys in the Support Unit were placed under the supervision of the County Attorney. The Unit's support staff, including secretaries and paralegals, however, remained under the supervision of the Finance Department.

On May 10, 1985, plaintiff was notified of his appointment as Deputy County Attorney, Grade II, by then-County Attorney Charles Valenza and was given the option of accepting or rejecting the position. As a Deputy County Attorney, Grade II, plain-

tiff's salary would be increased to nearly $38,000. In addition, plaintiff was informed at that time of a revision in the description of his duties and a change in his civil service classification. Prior to his May 1985 appointment, plaintiff was a member of the "competitive" civil service class. His position as a Deputy County Attorney, Grade II, however, was classified by the County Civil Service Commission as "exempt."

Plaintiff accepted the terms of his appointment on May 14, 1985, and was assigned to the Law Department of the County Attorney's Office. At that time, County Attorney Valenza designated plaintiff as "in charge" of the other paternity and support attorneys in the Office. At his deposition, plaintiff conceded that his position among the support attorneys was supervisory in nature.

According to plaintiff, his duties as Deputy County Attorney, required him to act as the liaison between the County Attorney and the attorneys in the Support Unit. He testified that he was responsible for "convey[ing] whatever thoughts or directions [the County Attorney] might have ..., and for ... inform[ing] him of what was happening in the area of support and paternity attorneys." Tranello Dep. at 29. Plaintiff remained in this supervisory role, at County Attorney Valenza's request, until plaintiff's termination in January 1988.

In November 1987, defendant Thomas Frey, a Democrat, was elected Monroe County Executive, defeating the Republican incumbent. Frey appointed defendant Patrick Malgieri, also a Democrat, to replace Valenza, a Republican, as County Attorney in December 1987.

Before taking office in January, Malgieri allegedly was told of problems concerning poor supervision and a lack of efficiency in the Support Unit by Margaret Burt, an attorney in the Public Defender's office. Burt is a Democrat, and at the time of her discussion with Malgieri was an applicant for a position in the County Attorney's office. She is currently employed as a Deputy County Attorney and her duties include supervision of the Support Unit.

On January 1, 1988, defendants Frey and Malgieri took office. On or about January 4, 1988, defendant Malgieri informed plaintiff of his termination. Malgieri claims that he discussed the reasons for the dismissal with plaintiff. According to Malgieri, plaintiff was informed that the principal reason for his termination was his failure to adequately supervise the Support Unit. Plaintiff, however, admits being told on the day of his dismissal only that there were some problems in the Unit. He denies that any further explanation was given. It is plaintiff's contention that the stated reasons for his termination are pretextual and that he was terminated because of his political affiliation and his age.

Subsequently, plaintiff filed charges with the Equal Employment Opportunity Commission and the New York State Division of Human Rights, claiming age discrimination. Plaintiff thereafter commenced this action, asserting that his termination violated his rights under the First, Fourth, Fifth and Fourteenth Amendments. He alleges, *inter alia*, that he was terminated because of his political affiliation and age, that his discharge without a pre-termination hearing constituted a deprivation of his property right in his job without due process of law, and that his termination was a breach of his employment contract.

Defendants move for summary judgment as to each of plaintiff's claims. At the outset, defendants argue that plaintiff's First Amendment and ADEA claims should be dismissed because plaintiff's position as a deputy county attorney brings him within the "policymaking" exemptions enunciated in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Second, defendants Frey and Malgieri contend that they are entitled to summary judgment based on qualified immunity. Next, defendants maintain that plaintiff's due process claims must fail because plaintiff did not have a property interest in his position. Finally, defendants allege that plaintiff's breach of contract claim is groundless since he was an "at-will" employee.

## DISCUSSION

### A. Summary Judgment: The Legal Standard.

Federal Rule of Civil Procedure 56(c) requires summary judgment where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of a summary judgment motion "is to isolate and dispose of factually unsupported claims...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden of demonstrating the lack of any genuine issue of material fact rests on the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

A genuine issue of material fact exists if the evidence in the record when the motion is made would permit reasonable jurors to return a verdict in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A party opposing summary judgment, if it bears the burden of proof at trial, must come forward with evidence showing the existence of facts from which a jury could return such a verdict. *See Celotex*, 477 U.S. at 324–25, 106 S.Ct. at 2553–54; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Ambiguities or inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the summary judgment motion. *Adickes*, 398 U.S. at 157, 90 S.Ct. at 1608.

### B. First Amendment Claims: Political Affiliation.

■ Plaintiff claims that he was terminated from his 16–year position as Deputy County Attorney because he was a Republican and was ousted by the incoming Democratic Administration. Defendants deny this but also claim that such a dismissal would not be improper under the First Amendment because of plaintiff's high level "policymaking" position within the Law Department.

Analysis of this issue begins with two United States Supreme Court decisions.

In *Elrod v. Burns*, 427 U.S. 347, 349, 355, 372–73, 96 S.Ct. 2673, 2678, 2680–81, 2689–90, 49 L.Ed.2d 547 (1976), the Supreme Court held that the dismissal of certain public employees solely because of their political affiliation violated the rights to freedom of political belief and association protected by the First Amendment.

The plurality opinion in *Elrod* also suggested that the same protection would not apply to policymaking and confidential employees in order to protect the power of an elected administration to implement its policies and goals. 427 U.S. at 367, 96 S.Ct. at 2686–87. Justice Brennan, writing for the plurality, acknowledged the difficulty of drawing a clear line between policymaking and nonpolicymaking positions. He noted that:

> An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

427 U.S. at 368, 96 S.Ct. at 2687.

Four years later, in *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court reaffirmed its disapproval of purely patronage dismissals in a case involving two Staten Island public defenders and reformulated the policymaking exception set forth in *Elrod*. The Supreme Court stated that:

> [T]he ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Branti*, 445 U.S. at 518, 100 S.Ct. at 1295.

The Court limited its holding to the case of public defenders and expressly declined to rule on whether assistant prosecutors could be dismissed for political affiliation.

*Branti,* 445 U.S. at 519 n. 13, 100 S.Ct. at 1295 n. 13.

The Second Circuit has recently considered the "policymaker" exemption in a case very similar to the circumstances of plaintiff's case. In *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988), the Court approved the firing of three public employees by the newly-elected Erie County executive. These employees were three of the one hundred and forty-three that held "exempt" positions with the County under New York Civil Service Law. The Court reversed the district court's preliminary injunction that enjoined the terminations.

The Court interpreted the language of *Branti* to mean "that political affiliation is an appropriate requirement when there is a rational connection between shared ideology and job performance." *Savage,* 850 F.2d at 68, (citing *Branti,* 445 U.S. at 518, 100 S.Ct. at 1294–95). This interpretation "would exempt from protection most policymaking and confidential employees, but not—as in the Court's example—a football coach at a state university." *Id.* In *Savage,* the Second Circuit concluded that "[a]ny other decision would severely handicap an incoming administrator's ability to carry out his proposed policies, thereby undercutting the effects of the electorate's vote." *Id.*

The recent Supreme Court case concerning patronage firings, *Rutan v. Republican Party of Illinois,* — U.S. —, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), did not alter the *Elrod–Branti* exemption for high level employees. The Court recognized that there are many government positions for which party affiliation is an appropriate requirement. Although the scope of the policymaking exception was not at issue in *Rutan* because the defendants in that case conceded that the plaintiff employees were not policymakers, the Court nevertheless affirmed the *Elrod–Branti* principle that "a government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high level employees on the basis of their political views." 110 S.Ct. at 2735 n. 5 and 2737.

For the purposes of this motion, the threshold issue is whether plaintiff held a confidential or policymaking position. *See Branti, supra; Livas v. Petka,* 711 F.2d 798, 800 (7th Cir.1983); *O'Connell v. Gorski,* 715 F.Supp. 1201, 1203 (W.D.N.Y. 1989); *Ecker v. Cohalan,* 542 F.Supp. 896, 910 (E.D.N.Y.1982). If so, then plaintiff would not be entitled to relief based on the *Elrod–Branti* exception for confidential policymaking employees.

At trial, of course, the threshold issue would be different. Plaintiff would have to show in the first instance that his Republican affiliation was a substantial or motivating factor in defendants' decision to fire him. *See O'Connell,* 715 F.Supp. at 1202. This aspect is in much dispute. Defendants claim that plaintiff's political registration was not a factor and was unknown to them. In any event, defendants' motivation in discharging plaintiff and their knowledge of his political affiliation clearly involve credibility determinations which may not be resolved on a motion for summary judgment. *O'Connell,* 715 F.Supp. at 1203.

Assuming that plaintiff's contentions are true, however, summary judgment may still be granted for defendants on plaintiff's First Amendment claim if plaintiff held a confidential or policymaking position.

Plaintiff contends that the proper inquiry in determining policymaker status is whether the plaintiff *in fact* performed confidential, policymaking functions. Plaintiff portrays his role in the County Attorney's office as performing purely technical legal work in Family Court. In particular, plaintiff states that during his sixteen years as an attorney for the county his duties consisted entirely of paternity and support matters. He claims that he was a mere administrative employee with no real policymaking power. Consequently, plaintiff argues that his *actual* duties rather than the "inherent powers" of his office should control.

In my view, the law is to the contrary. It is the power inherent in the office that controls. The proper focus in this case is

on the "powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985); *see also Stott v. Haworth*, 916 F.2d 134, 142 (4th Cir.1990) (look to powers inherent in the office); *Brown v. Trench*, 787 F.2d 167, 168 (3d Cir.1986) (look to "function of the public office in question and not the actual past duties of the particular employee involved."); *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–42 (1st Cir. 1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987) (same); *Bauer v. Bosley*, 802 F.2d 1058, 1064 (8th Cir. 1986), *cert. denied*, 481 U.S. 1038, 107 S.Ct. 1976, 95 L.Ed.2d 816 (1987) (same); *O'Connell*, 715 F.Supp. at 1203 (the determinative inquiry "is not what functions the public employee actually performed but rather what duties he was actually empowered to perform and which ones were inherent in the public office he held.").

The Court in *Tomczak v. City of Chicago* stated that:

> [I]f an officeholder performs fewer or less important functions than usually attend his position, he may still be exempt from the prohibition against political terminations if his position *inherently* encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance. In this court's reiteration of the *Branti* formulation, we emphasized the functions of the office involved, not the officeholder: "The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decision making on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982).

765 F.2d at 641 (emphasis added).

The Second Circuit has specifically adopted this analysis. In *Savage*, 850 F.2d at 66, the Court looked to the "position's job description," rather than the employee's actual duties, in determining whether the employee was a policymaker. Under this standard, it is more important to examine plaintiff's job description and the powers conferred by county law than to analyze the tasks actually performed by plaintiff.

The office of Deputy County Attorney, Grade II, is inherently confidential and the fact that plaintiff may have handled litigation in Family Court for most of his tenure does not change the confidential nature of his position. *See O'Connell*, 715 F.Supp. at 1204; *Finkelstein v. Barthelemy*, 678 F.Supp. 1255 (E.D.La.1988) (and cases cited therein). It is irrelevant that plaintiff's actual role may have been highly constricted.

Under the Monroe County Charter, New York County Law § 502 and the job description for a Deputy County Attorney, Grade II, it is contemplated that deputy county attorneys may be relied upon "for the legal advice necessary to implement policy." *Ness v. Marshall*, 660 F.2d at 522. That one County Attorney may have chosen not to employ his deputies in this manner should not prevent future County Attorneys from delegating their power to the fullest extent authorized by law.

New York County Law, § 502(1) provides that the County Attorney may appoint assistants and may revoke those appointments at any time. Section 502(2) provides that assistants may perform "such duties pertaining to the office as may be directed by the County Attorney."

The Monroe County Charter, Section 614,[1] provides, in relevant part, that:

> The County Attorney shall have the following powers and duties: (1) To serve as the legal advisor for the County and, on its behalf in county matters, of its officers and agencies; (2) To serve as legal advisor to the county legislature; (3) To advise all county officers and em-

---

1. The County Charter was amended after plaintiff's termination. *See* Monroe County Charter, Section C6–6. The powers and duties of the County Attorney listed above remain exactly the same, however, under the amended version.

ployees in all county matters of a legal nature ...; (4) To prosecute or defend all actions or proceedings of a civil nature brought by or against the county; ... (9) To appoint one or more deputy county attorneys, subject to the approval of the county executive; ...

Moreover, plaintiff's job description shows that his position as a Deputy County Attorney, Grade II, inherently encompassed tasks that rendered his political affiliation an appropriate prerequisite for effective performance. The job description contains a list of "Typical Work Activities" that may be performed, "depending upon assignment by the County Attorney." According to plaintiff's job description, a Deputy County Attorney, Grade II:

> Counsels with and advises County Legislators, the County Executive, County Commissioners, department heads, and other County officials and personnel on questions of law affecting the County and its various departments and offices; Conducts the handling of claims and litigation on behalf of the County, its departments and offices....

This job description provides that a Deputy County Attorney may render "legal advice to County officials" and may perform any other "duties as may be assigned by the County Attorney."[2]

The County Attorney and his Deputies are empowered to give legal advice to various County officials. They are also entitled to litigate on behalf of the County and its departments. Since plaintiff was authorized to perform whatever duties pertaining to the office of the County Attorney as were delegated to him, he was clearly a confidential employee. N.Y.County Law § 502(2) and (3); O'Connell, 715 F.Supp. at 1204.

Government attorneys, because they are attorneys, must advocate the positions of and counsel the government officials for whom they work. Finkelstein, 678 F.Supp. at 1265. Legal decisions made by a governmental entity may encompass political beliefs and concerns. Thus, a Coun-

ty Executive or a County Attorney is entitled to have counselors who support his political beliefs and agenda. Ness v. Marshall, 660 F.2d at 522; Finkelstein, 678 F.Supp. at 1265. Unlike most civil servants, "attorneys who work for a local government should realize, even before they are hired, that their tenure often has much less to do with their competency than with the day-to-day happenstance of partisan affiliations of the local leaders whom they advise and counsel." Finkelstein, 678 F.Supp. at 1265.

There are several additional reasons to place plaintiff's job at the policymaking end of the spectrum, "where the individual employee's political or social philosophy can make a difference...." Savage, 850 F.2d at 69. First, as Deputy County Attorney, Grade II, plaintiff had a high salary, "a common characteristic of policymaking positions." Id. at 68. At the time of his dismissal in January 1988, plaintiff's annual salary was $46,770. This salary indicates that plaintiff held a confidential or policymaking position.

Next, plaintiff's position was classified as "exempt" under New York State Civil Service Law. In the interests of federalism, the Court must give "substantial deference" to the state's judgment to exempt this position. Savage, 850 F.2d at 69. "Otherwise, federal courts will be embroiled in determining at each change of state or local administration which positions are appropriately within the political patronage system." Id.

Furthermore, the determination concerning whether to exempt plaintiff's position from First Amendment protection involves essentially the same factors and considerations that New York State and Monroe County considered in exempting this position from the State's constitutionally-required civil service system. Savage, 850 F.2d at 69.

In Savage, the Second Circuit noted that " '[t]he criteria [used to designate a position as exempt] are the confidential nature

---

**2.** The Court takes note that this job description was written by defendant Malgieri's predeces-

sor, Republican County Attorney Charles Valenza.

of the position, the performance of duties which require the exercise of authority and discretion at a high level, or the need ... to have some expertise or personal qualities which cannot be measured by a competitive exam.'" *Savage,* 850 F.2d at 69 (quoting *Burke v. Axelrod,* 90 A.D.2d 577, 578, 456 N.Y.S.2d 135, 137 (3d Dep't 1982)). Consequently, plaintiff's position, as a matter of law, was of a confidential, policymaking nature. Since there was a rational connection between shared ideology and job performance concerning the position of Deputy County Attorney, Grade II, plaintiff was subject to termination under the *Elrod–Branti* exemption for policymakers. Therefore, defendants' motion for summary judgment is granted as to plaintiff's First Amendment claims.

### C. Qualified Immunity.

■ Alternatively, defendants Frey and Malgieri move for summary judgment on the grounds that they are entitled to qualified immunity. The parties in this case do not dispute what constitutes the elements of this defense. Rather, they contest whether the law was "clearly established" at the time plaintiff was discharged.

The Supreme Court has held that "government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The standard for determining qualified immunity in federal court "was designed to facilitate resolution of the defense on a motion for summary judgment." *Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

The touchstone of the qualified immunity defense is "objective legal reasonableness." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). The principal issue, therefore, is whether, in January 1988, plaintiff had a clearly established constitutional or statutory right not to be terminated from his position because of his political affiliation. *See Hawkins v. Steingut,* 829 F.2d 317, 319 (2d Cir.1987). Only if plaintiff had such a right, and the individual defendants should reasonably have known that their conduct was illegal, would these defendants lose the protection of qualified immunity. *Id.*

Obviously, in light of my ruling in Part B of this decision, I believe that plaintiff had no such right. I believe that the *Elrod* and *Branti* cases from the Supreme Court, and their progeny, demonstrate that plaintiff's firing could be justified depending on the nature of his duties. At the very least, these cases indicate that the law was not clearly established at the time of plaintiff's discharge. In fact, the Second Circuit in 1987 stated that:

> While *Elrod* and *Branti* developed a useful framework for assessing the constitutionality of patronage dismissals, it cannot be said that these decisions clearly established the law with respect to every governmental position. Following *Branti,* the courts have proceeded on a case by case basis to enumerate the permissible and impermissible instances of politically motivated employment decisions; however, the *Branti* guidelines do not lend themselves to easy or automatic application.

*Hawkins,* 829 F.2d at 320.

In *Finkelstein v. Barthelemy,* 678 F.Supp. 1255, 1260 (E.D.La.1988), the court listed numerous cases, decided prior to 1988, where courts upheld the political dismissal of government attorneys, even those whose actual work was narrowly limited to specific, non-controversial areas and who had several superiors over them. These cases indicate a reluctance to define the *Elrod/Branti* exception too narrowly.

Since the law was not clearly established in plaintiff's favor in January 1988, the individual defendants could have believed in good faith and with objective reasonableness that the firing was constitutionally permissible. Therefore, in the alternative, defendants Frey and Malgieri are entitled to summary judgment on plaintiff's First Amendment claims.

### D. ADEA Claim.

1. The Definition of an "Employee" Under the ADEA.

■ The defendants move for summary judgment on plaintiff's age discrimination claims arguing that plaintiff falls within an exception to the ADEA's definition of "employee." Defendants maintain that as a policymaker and legal adviser plaintiff is excluded from the protection of the ADEA. The defendants further allege that analysis of the ADEA exclusion for policymaking employees is identical to the reasoning applied to plaintiff's First Amendment claims. *See, e.g., E.E.O.C. v. Reno,* 758 F.2d 581 (11th Cir.1985). For the reasons set forth below, defendants' interpretation of the ADEA exception must be rejected.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In defining the term "employee," however, the Act expressly excepts elected public officials, persons appointed by an elected official to his or her personal staff and "appointee[s] on the policy-making level or ... immediate adviser[s] with respect to the exercise of the constitutional or legal powers of the office." 29 U.S.C. § 630(f).

In contrast with the First Amendment exception, the policymaker exception to the ADEA definition of "employee" must be construed narrowly. *See E.E.O.C. v. Vermont,* 904 F.2d 794, 800 (2d Cir.1990). In *Vermont,* the Second Circuit recently analyzed the scope of the policymaking exception to the Act's definition of "employee":

The definition of "employee" excepts two broad groups from the protection of the Act. The first group is elected officials of a state or its political subdivisions; the second group is certain, though not all, of the persons appointed by those elected officials. The second group comprises three categories of such appointees: *i.e.,* (1) "person[s] chosen by such officer to be on such officer's personal staff," (2) "appointee[s] on the policymaking level" ..., and (3) "immediate adviser[s] with respect to the exercise of the constitutional or legal powers of the office."

904 F.2d at 797–98.

The Court concluded that the policymaker category of § 630(f) comprises only those employees working closely with the elected official who appointed them. *Id.* at 798. "Plainly, the first and third categories, *i.e.,* the elected official's personal staff and his immediate advisers, refer to persons who would work closely with the elected official, and we would infer that the middle category was intended to share basic characteristics of the categories that surrounded it." *Id.* Moreover, the Court in *Vermont* expressly rejected the argument made by defendants here that the policymaker exception covers *any* person appointed to a policymaking position. *Id.*

The definition of "employee" under the ADEA is the same definition as that found under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Clearly, Title VII was a model for the ADEA. *See Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978) (the "prohibitions of the ADEA were derived in *haec verba* from Title VII"). Therefore, although there is no legislative history with respect to the definition of "employee" in the ADEA, there is legislative history concerning Title VII and the exemptions of covered employees. In fact, the Court of Appeals in *E.E.O.C. v. Vermont* relied upon the legislative history of § 2000e(f)'s exceptions to the definition of a Title VII "employee." 904 F.2d at 798–800.

The legislative history of § 2000e(f) makes clear that the policymaking exception to Title VII is to be construed narrowly. For example, during Senate debate on the 1972 amendments to Title VII, Senator Jacob Javits argued that it was necessary to limit the scope of the "adviser" exception in the definition of "employee." *Vermont,* 904 F.2d at 799 (citing 118 Cong.Rec. 4097 (1972)). Senator Javits suggested confining the immediate adviser exception to higher officials in a "policymaking or policy advising capacity." *Id.* He added:

"The other thing, the immediate advisers, I was thinking more in terms of a cabinet, of a Governor who would call his commissioners a cabinet, or he may have a cabinet composed of three or four executive officials, or five or six, who would do the main and important things. That is what I would define those things to expressly mean."

*Id.* (quoting 118 Cong.Rec. at 4493).

In the end, the House and Senate conferees agreed to add a policymaker category to the group of appointees to be excluded from the protection of Title VII. *Id.*

Finally, the legislative history of § 2000e(f) contains the following statement issued by the conferees:

"It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisers or to policymaking positions *at the highest levels* of the departments or agencies of State and local governments, *such as cabinet officers*, and persons with comparable responsibilities at the local level."

*Id.* at 800 (quoting 1972 U.S.Code Cong. & Admin.News 2137, 2180) (emphasis added).

In the instant case, plaintiff was neither an elected official nor an appointee of an elected official. The legislative history shows that only those policymakers chosen by the county executive "who are in a close personal relationship [or] an immediate relationship with him" may be exempt from the coverage of the ADEA. 904 F.2d at 799 (quoting 118 Cong.Rec. 4492–93 (1972)). Since plaintiff was not appointed by the county executive, he does not fall within the statutory exception for "appointees on the policymaking level."

Although it is somewhat anomalous that plaintiff is a policymaker under the First Amendment analysis but not under the ADEA, there are valid reasons for the difference. First, unlike the judicially created *Elrod/Branti* guidelines which do not lend

themselves to easy or automatic application, *Hawkins v. Steingut,* supra, the ADEA exception for policymaking employees was created by statute. Further, the Second Circuit has interpreted the *Elrod/Branti* exception broadly to exempt most confidential and policymaking employees from First Amendment protection. *Savage,* 850 F.2d at 68.

On the other hand, Title VII's legislative history supports a narrow interpretation of § 630(f) and its exceptions. Relying on this legislative history, the Second Circuit has rejected the notion that the ADEA policymaker exception covers any person appointed to a policymaking position. *Vermont,* 904 F.2d at 798. This is in keeping with the broad scope of the ADEA and its purpose of eliminating age discrimination.

Although it may be reasonable to liberally construe the policymaker exception under First Amendment analysis to assure that policies of newly elected officials are implemented, it does not follow that the exceptions under the ADEA should be similarly construed. Such a broad interpretation would only dilute the age discrimination prohibitions without any corresponding benefit to the elected official. An elected official may be able to pick his advisors for their loyalty, but it does not follow that he can exclude certain ones solely because of age.

In view of the narrow way in which the policymaker exception has been interpreted by the Second Circuit, plaintiff was not a person "on the policymaking level" as that term is used in § 630(f) of the ADEA. Consequently, defendants' motion for summary judgment on plaintiff's ADEA claim must be denied.

2. Plaintiff's Motion for Summary Judgment on the ADEA Claim.

 Plaintiff contends that he is entitled to summary judgment on the issue of liability under the ADEA.[3] Plaintiff ar-

---

**3.** Plaintiff also alleges that the defendants violated his civil rights when they allegedly terminated him because of his age. The ADEA, however, provides the exclusive remedy for age dis-

crimination claims. *Frye v. Grandy,* 625 F.Supp. 1573, 1576 (D.Md.1986); *McCroan v. Bailey,* 543 F.Supp. 1201, 1209 (S.D.Ga.1982). In other words, passage of the ADEA preempted

gues that he has made out a prima facie case by showing that he is a member of the protected class and that he was replaced by a younger person with less experience. Plaintiff states that the defendants' purported reasons justifying the termination were merely pretextual. The proof of this, according to plaintiff, is the fact that defendant Malgieri's only source concerning plaintiff's alleged incompetence was Margaret Burt, a prospective job applicant. In addition, plaintiff claims that defendants, after taking office, fired or transferred all attorneys over the age of 50 in the County Law Department.

Defendants, on the other hand, allege that plaintiff was terminated for cause because of his failure to adequately supervise the attorneys in the Support Unit. The defendants' motivation and claimed legitimate reason for the dismissal raise genuine issues of material fact which may not be resolved on this motion. For this reason, plaintiff's cross-motion for summary judgment must also be denied.

3. The Status of Defendants Frey and Malgieri as "Employers" Under the ADEA.

█ Defendants Frey and Malgieri move for summary judgment as to plaintiff's ADEA claims on an alternative ground. Specifically, Frey and Malgieri argue that they are not "employers" under the ADEA, and are therefore not subject to suit under that statute.

The term "employer" under the ADEA "means a person engaged in an industry affecting commerce who has twenty or more employees ... [and] (1) any agent of such a person, and (2) a State or political subdivision of a State and any agency or instrumentality of a State or political subdivision of a State." 29 U.S.C. § 630(b). The Act also defines the term "person." This definition, however, does not include any reference to states and political subdivisions. 29 U.S.C. § 630(a).

█ Section 630(b) refers expressly to an agent of a "person" as an employer but fails to refer to an agent of a state or its instrumentalities. Apparently, Congress made no provision for agents of states and political subdivisions. Consequently, the Court concludes that agents of a state or political subdivision of a state are not employers within the meaning of 29 U.S.C. § 630(b). *See also Sagarino v. Town of Danvers,* 750 F.Supp. 51, 52 (D.Mass.1990) (Town attorney not an employer under the ADEA); *Price v. County of Erie,* 654 F.Supp. 1206, 1207 (W.D.N.Y.1987) ("A fair reading of the statute's language is that agents of a state's instrumentalities ... are not employers within the contours of the ADEA"); *Young v. Sedgwick County,* 660 F.Supp. 918, 924 (D.Kan.1987); *McCroan v. Bailey,* 543 F.Supp. 1201, 1210–11 (S.D.Ga.1982).

The statute itself clearly reflects a difference between those engaged in commerce and political subdivisions. Congress could have changed the result. "It would have only required the insertion of the short phrase 'and their agents' in 29 U.S.C. § 630(b)(2) to express Congress' intent to hold individuals such as these defendants liable for age discrimination." *Ditch v. Board of County Commissioners,* 650 F.Supp. 1245, 1251 (1986), *modified on other grounds,* 669 F.Supp. 1553 (D.Kan.1987).

The legislative history of amendments to the ADEA and Title VII lends support to the view that Congress intended to exclude from the proscriptions of the ADEA agents of states and political subdivisions. *See Price v. County of Erie,* 654 F.Supp. 1206, 1207–08 (W.D.N.Y.1987). For example, Title VII and the ADEA originally applied only to certain private employers. Then, in 1972, Title VII was amended to expressly include within its parameters state and local governments. Likewise, the definition of the term "person" in Title VII was also changed to include governments, governmental agencies and political subdivisions. *See* 42 U.S.C. § 2000e(a); *Price,* 654 F.Supp. at 1208. By amending the Title

---

plaintiff's cause of action under 42 U.S.C. §§ 1983 and 1985 for age discrimination. *See Great American Fed. S. & L. Ass'n v. Novotny,*

442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

VII definition of "person," Congress clearly designated agents of states and their instrumentalities as "employers." Congress, however, failed to follow this pattern in 1974 when it amended the ADEA. *Price*, 654 F.Supp. at 1208.

Given the language of the ADEA, this Court finds that plaintiff's ADEA claim against defendants Frey and Malgieri fails to state a cause of action. Thus, the individual defendants are entitled to judgment as a matter of law.

### E. Deprivation of Property Interest.

■ The defendants also move for summary judgment on plaintiff's due process claims asserting that plaintiff did not have a property interest in his position. Plaintiff, however, contends that he was entitled to a pre-termination hearing pursuant to § 75 of the New York State Civil Service Law. Since the defendants failed to provide such a hearing, plaintiff alleges that defendants deprived him of his property, in violation of his Fourteenth Amendment right to due process.

However, "[a] property interest in a particular position arises only when an individual possesses 'a legitimate claim of entitlement' to continued job tenure. Such entitlements are not created by the Constitution, but rather by independent sources such as state law." *Hawkins v. Steingut*, 829 F.2d 317, 321 (2d Cir.1987) (citations omitted). In plaintiff's case, the controlling state law does not create a "legitimate claim of entitlement" to continuing job tenure. *See* N.Y. County Law § 502(1).

Plaintiff, as a member of the exempt class of the Civil Service, did not hold his "position by right of entitlement but, rather, at the pleasure of the [County Attorney]." *DeLucia v. Lefkowitz*, 62 A.D.2d 674, 406 N.Y.S.2d 150, 152 (3d Dep't 1978), *aff'd sub nom. Hopkins v. Lefkowitz*, 48 N.Y.2d 901, 424 N.Y.S.2d 897, 400 N.E.2d 1349 (1979). In fact, section 502(1) of the County Law provides that "any such appointment [of an assistant county attorney] may be revoked by the county attorney *at any time....*" (emphasis added).

■ Plaintiff also claims that he is entitled to job protection as a World War II veteran. He claims that he is protected by New York Civil Service Law § 75(1)(b) which protects certain employees, including veterans, from removal "except for incompetency or misconduct shown after a hearing...." The parties agree that only the category defined in § 75(1)(b) is relevant to plaintiff. Section 75(1)(b) provides protection to:

> [A] person holding a position by permanent appointment or employment in the classified service of the state or in the several cities, counties, towns or villages thereof, or in any other political or civil division of the state or of a municipality, ... who was honorably discharged or released under honorable circumstances from the armed forces of the United States having served therein as such member in time of war defined in section eighty-five of this chapter, ... *except when a person described in this paragraph holds the position of private secretary, cashier or deputy of any official or department.*

(emphasis added).

The crucial issue to be decided here is whether, as a matter of law, plaintiff was a "deputy" as that term is used in the veterans' discharge statute, § 75(1)(b). A review of the state court decisions interpreting § 75(1)(b), and its predecessor statute, reveals that the term "deputy" has been construed broadly in cases involving government attorneys. *See Byrnes v. Windels*, 265 N.Y. 403, 193 N.E. 248 (1934); *DeLucia v. Lefkowitz*, supra; *Clarke v. O'Brien*, 91 Misc.2d 190, 397 N.Y.S.2d 509 (Sup.Ct. Suffolk Co.1975), *aff'd*, 56 A.D.2d 869, 392 N.Y.S.2d 383 (2d Dep't 1977); *Darcy v. Fraiman*, 49 Misc.2d 319, 267 N.Y.S.2d 455 (Sup.Ct.N.Y.Co.), *aff'd*, 25 A.D.2d 951, 270 N.Y.S.2d 374 (1st Dep't), *appeal denied*, 18 N.Y.2d 578, 274 N.Y. S.2d 1025, 220 N.E.2d 813 (1966).

"An appointee's status as deputy is determined not by what the appointee in fact does but by what he is directed or authorized to do by statute, i.e. whether there is a statute authorizing the principal officer

to delegate his duties to the subordinate." *Clarke v. O'Brien*, 397 N.Y.S.2d at 511; *see also Behringer v. Parisi*, 5 N.Y.2d 147, 151, 182 N.Y.S.2d 365, 156 N.E.2d 71 (1959) ("It is sufficient if a statute *authorizes* the delegation . . . of duties") (emphasis in original).

In *Clarke*, a case virtually identical to the present one, an assistant district attorney in the exempt class sought reinstatement under § 75(1)(b) after his appointment was revoked. The *Clarke* court found that § 702 of the N.Y. County Law authorized the district attorney to delegate duties to his assistants and, in turn, directed his assistants to perform the powers and duties of the office in the principal's absence. 397 N.Y.S.2d at 511. This authorization was sufficient to bring the assistant district attorney in that case within the statutory exclusion for "deputies." The court also noted that "the nature of the position requires that [the district attorney] be entitled to appoint and remove his assistants at will." *Id.*

Significantly, § 502 of the County Law, which applies to assistant county attorneys, is identical to § 702. Section 502(1) empowers the county attorney to revoke the appointment of an assistant county attorney at any time. Subdivision 2 mandates the performance by the assistant of such duties pertaining to the office as the county attorney may direct.

■ Plaintiff contends, however, that § 41(1)(b) of the N.Y. Civil Service Law narrowly defines the term "deputy" and that this definition governs the meaning of the term "deputy" in the veterans' discharge statute. Section 41(1)(b) provides that "the deputies of principal executive officers authorized by law to act generally for and in place of their principals" shall be members of the exempt class of the Civil Service.

New York courts have rejected plaintiff's contention that the meaning of the term "deputy" in § 41(1)(b) limits use of the term "deputy" in § 75(1)(b). *See, e.g., Byrnes v. Windels*, 265 N.Y. at 409, 193 N.E. 248 (use of the word "deputy" in predecessor statute to § 41(1)(b) was "not

intended to be a definition or limitation upon the use of word throughout the entire act"); *DeLucia v. Lefkowitz*, 62 A.D.2d 674, 406 N.Y.S.2d at 152 ("The term, as used in section 75 of the Civil Service Law, may be broader in meaning than the term as used in subdivision 1 of section 41."); *Clarke*, 397 N.Y.S.2d at 511 (same). Accordingly, this court declines to impose a narrower interpretation of the word "deputy" than a New York State court would in this situation.

Based on the above authority, plaintiff was not in a protected class and was not entitled to a pre-termination hearing. Therefore, defendants are entitled to summary judgment on plaintiff's due process claims.

*F. Breach of Contract.*

■ Finally, defendants move for summary judgment on the grounds that there was no breach of an employment contract because plaintiff was an "at-will" employee. Plaintiff, on the other hand, responds that the defendants breached an employment contract by failing to provide him with a pre-termination hearing. Plaintiff's only basis for this claim is § 75(1)(b) of the Civil Service Law, the veterans' discharge statute, which I have rejected in Part E. In any event, plaintiff's claim that he had a lifetime contract with the County of Monroe is clearly untenable.

First, there was no written employment contract guaranteeing a position with the County for life. Second, New York County Law expressly provides that plaintiff's appointment as a deputy county attorney "may be revoked by the county attorney *at any time.*" N.Y. County Law § 502(1) (emphasis added). Finally, it is well-settled in New York that "where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86 (1983); *see Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919 (1987).

Furthermore, plaintiff has not introduced any evidence that the defendants expressly

limited their right to terminate him. *See O'Connor v. Eastman Kodak Co.*, 65 N.Y.2d 724, 725, 492 N.Y.S.2d 9, 10, 481 N.E.2d 549 (1985) (affirming summary judgment for employer where there was no express limitation of defendant's common-law right). Since plaintiff's employment relationship was at-will, defendants' motion for summary judgment is granted, dismissing plaintiff's breach of contract claim.

## CONCLUSION

Defendants' motion for summary judgment is granted, in part and denied in part. Summary judgment is granted in favor of defendants as to the First, Second, Third, Fourth, Sixth and Seventh Causes of Action in plaintiff's amended complaint.

Summary judgment is denied as to plaintiff's ADEA claim, the Fifth Cause of Action in the complaint.

Plaintiff's cross-motion for summary judgment is denied.

IT IS SO ORDERED.